**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY**

JOSEPH JOHN OKA,

     *Plaintiff,*

     v.

UNITED AIRLINES, INC. &
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL

     *Defendants.*

**Case No. 2:23-CV-135-DLB-CJS**

**COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. Section 5 of the Kentucky Constitution states: "the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching." Furthermore, "[n]o human authority shall, in any case whatever, control or interfere with the rights of conscience."

2. Kentucky state law has been created to mirror these civil rights in many settings, including employment, to safeguard the liberties of the citizens of Kentucky.

3. United Airlines, Inc., and the Air Line Pilots Association, International, have elected to woefully violate these safeguards, at the expense of their loyal employees and union members, with no possible justification for doing so.

4. Plaintiff Joseph John Oka ("Mr. Oka" or "Plaintiff") seeks relief from Defendants United Airlines, Inc. 's ("United's") and the Air Line Pilots Association's (ALPA's) pattern of discriminatory, unconstitutional, and illegal behavior against employees who request religious or medical exemptions from United's COVID-19 vaccination mandate policy.

5. United implemented a COVID-19 vaccine mandate as a condition of employment for all employees, including Plaintiff, that was tyrannical, coercive, and lacking in all scientific reasoning.

6. As a result of United's illegal policies, Mr. Oka was subject to religious discrimination at the hands of United Airlines, Inc.

7. United's unlawful actions left Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of his body by receiving an experimental COVID-19 biologic, at the expense of his religious beliefs, bodily autonomy, medical privacy, and at risk to his health, or losing his livelihood and being unable to provide support for himself and his family.

8. This Faustian bargain is no bargain at all and is precisely what is forbidden by Kentucky law. The relief sought herein is precisely what both those laws expressly approve: equitable relief.

9. The Plaintiff only seeks this court to order that United and ALPA comply with the laws protecting the rights of Kentucky citizens against precisely such Catch-22 "choices."

10. Plaintiff now seeks declaratory and compensatory relief for United Airlines, Inc.'s illegal COVID-19 vaccination mandate that was improperly supported by the Air Line Pilots Association, International, and the financial and emotional distress injury Plaintiff sustained as a result.

11. This case calls into question whether a large, private corporation, such as United Airlines, with the backing of union leadership that wasn't supporting its members, can force employees to submit to experimental medical procedures as a condition of continued employment through the implementation of a mandate.

12. In August 2021, when United initiated a compulsory vaccination mandate for its unionized pilot personnel, there was scarcely any resistance from Defendant ALPA. Despite being the exclusive collective bargaining representative for United's pilots and amid negotiations for a new contract under a previously negotiated and amendable collective bargaining agreement, ALPA did not challenge the vaccination directive.

13. The pilots' union not only refrained from opposing the enforced vaccination program on its members, but also attempted to dissuade members from lodging any complaints against the program.

14. When pilots did register "status quo" grievances, Defendant ALPA restricted the scope of these grievances, ensuring that the actual vaccination program, which changed the employment conditions, was not questioned.

15. The union eventually opted to halt the processing of grievances from unvaccinated pilots, despite having received legal analyses indicating that the initial grievances were valid under the United Pilots Agreement ("UPA") and were suitable for challenging United's vaccine mandate.

16. The union's actions represented the climax of a deliberate effort, spanning nearly two years, to ensure the enforcement of United's vaccine mandate on Defendant's membership. This was done to retain United's federal funding and align with the political narrative set by the current administration.

## PARTIES

17. Plaintiff Joseph John Oka is a citizen and resident of Kentucky in Kenton County. He was a first officer for United Airlines and a dues-paying member in good standing of Air

Line Pilots Association, International, until he was effectively terminated for refusing to comply with United Airlines' mandatory COVID vaccination requirements.

18.  Defendant United Airlines, Inc. ("United"), is a large, major American airline headquartered at Willis Tower in Chicago, Illinois. United Operates a large domestic and international route network with a fleet of roughly 834 aircraft and approximately 67,000 employees. United is the current employer of Plaintiff.

19. Defendant Air Line Pilots Association, International ("ALPA") is the largest pilot union in the world, representing more than 75,000 pilots from 43 U.S. and Canadian airlines. Its headquarters are in McLean, Virginia.

20. At all relevant times, United and ALPA knew or should have known the laws, policies, practices, and conditions alleged herein.

## JURISDICTION AND VENUE

21.  This Court has original jurisdiction over the subject matter of this dispute pursuant to 28 United States Code ("U.S.C.") Section 1331. Plaintiff seeks remedies under Title VII of the Civil Rights Act pursuant to 42 U.S.C. § 2000e et seq. and the Railway Labor Act pursuant to 48 U.S.C. § 151 et seq.

22. This Court has supplemental jurisdiction over the state claims raised in this matter pursuant to 28 U.S.C. § 1367. Plaintiff seeks remedies under Kentucky's civil rights law.

23. Venue is proper under 28 U.S.C. §1391(b)-(e) because substantial parts of the acts or omissions giving rise to the claim occurred in this district.

24. An actual and justiciable controversy exists between Plaintiff and Defendants.

## FACTS AND BACKGROUND

25. On August 6, 2021, United emerged as the first airline carrier and one of the initial large corporations to require a COVID-19 vaccine as a prerequisite for employment for its workforce.

26. Around April 15, 2020, United received approximately $5 billion in funds through the Federal Coronavirus Aid, Relief, and Economic Security ("CARES") Act. The company reaped further financial benefits through subsequent federal initiatives such as the Payroll Support Program and the American Rescue Plan, alongside federal contracts.

27. Based on information and belief, ALPA fully backed all COVID-19 measures taken by United aiming to preserve the airline's federal funding. This included a substantial increase in United's credit line shortly after United Chairman Scott Kirby expressed his inclination for achieving a 100 percent vaccination rate within the firm.

28. United's declaration on August 6, 2021, of mandating COVID-19 vaccinations came after several months of misleading actions, manipulation, and coercion by United to incentivize employees to "voluntarily" get vaccinated, initially offering additional pay and benefits, and later through threats of wage loss and termination.

29. Under the pretense of ensuring safety, United resolved to be the first in the aviation sector to require the COVID-19 vaccine. In making this decision, United significantly intruded into the lives and well-being of every employee, pressuring them to undergo an experimental medical procedure that impacts their lives beyond the workplace.

30. United announced that all employees would be required to become fully vaccinated for COVID-19 within five weeks of the FDA granting full approval of a vaccine, or five weeks after September 20, 2021, whichever came first. While initially setting a date in

late October as the deadline for employees to prove their vaccination status, United
Airlines, Inc. ultimately moved the deadline to September 27, 2021.

31. To become "fully vaccinated" an employee was required to show proof that he or she
received two doses of the Pfizer or Moderna vaccine or one dose of the Johnson &
Johnson vaccine. Employees who remained unvaccinated by that deadline would be
terminated.

32. United implemented an accommodation request system in which Plaintiff was given the
option to request accommodations based on religious beliefs or medical reasons via
United's Reasonable Accommodation Process ("RAP"). Employees were not allowed to
seek both religious and medical accommodations, but were forced to choose between
their constitutionally and federally protected rights.

33. The system description on the Flying Together United Company website led United
employees to believe that the RAP process would be interactive.  It was reasonable for
Mr. Oka to believe the company description, and he relied on this description as a
promise that he would have a meeting with his supervisor and human relations personnel
on how he could continue working. That meeting has never happened.

34. Plaintiff was required to submit his exemption and accommodation request by August 31,
2021. After that date, no requests would be accepted.

35. On or about September 9, 2021, United began granting requests for "accommodations"
stating that for any accommodation request granted, those employees who sought the
same would be placed on indefinite, unpaid leave, with no benefits. This was no
accommodation at all but another name for being constructively fired.

36. United never provided any "accommodated" employee or Plaintiff with a date by which they could return to work; and stated this period of unpaid leave might last up to 72 months.

37. Plaintiff was informed that any employee whose accommodation request was denied must receive the vaccine by September 27, 2021, or be terminated.

38. Plaintiff and his colleagues were never meaningfully considered for accommodations, and those exemptions granted were essentially the same as being terminated by being placed into an unpaid medical leave or unpaid leave of absence for an unknown period of time.

39. This adverse employment action was unreasonable, open-ended, punitive, and retaliatory in nature to all employees who did not choose to be vaccinated. United's coercive policy was done with the intent to discriminate, segregate, humiliate, and intimidate employees who sought an exemption on religious or medical grounds.

40. While United sought a 100 percent vaccination rate for flight crew, the passengers had no such vaccine requirement and were allowed to board wearing a mask. Even after removing all unvaccinated crew members from its ranks, United never operated a single passenger flight that contained only vaccinated persons. It is clear, the intent was never safety, it was the appearance of safety, at the expense of the rights of employees who did not receive the experimental vaccine, which does not prevent the spread of COVID-19.

41. Indeed, having a fully vaccinated workforce did not prevent the spread of the COVID-19 virus at United Airlines.

*ALPA Shifts Stance to Back United's Mandate*

42. Throughout the unfolding of the events delineated in this Complaint, both ALPA and United were functioning under the stipulations of an amendable, to-be-negotiated collective bargaining agreement. Given this scenario, the Railway Labor Act ("RLA") mandated all parties to adhere to the terms and conditions set forth in the previous collective bargaining agreement until a new one was formalized.

43. Merely two weeks after United CEO Scott Kirby's hinting at a foreseeable compulsory vaccination within the workplace, ALPA reflected Kirby's statements in a memo distributed to its membership on January 25, 2021. Defendant ALPA wrongly asserted that a vaccine mandate was contractually allowed (though provided no backing from the United Pilots' Agreement) and sought to downplay the likelihood of individual exemptions on religious or disability grounds.

44. ALPA did not at any point conduct a survey or engage in discussions with its membership regarding opposing a vaccine mandate enforced by United's management. Contrarily, ALPA, in violation of the Railway Labor Act and its collective bargaining duties, initiated a collaborative endeavor with United to enforce vaccination mandates on its workforce, partially or wholly, to sustain federal funding.

45. Initially, ALPA acknowledged the problems inherent in United's obligatory vaccination scheme when it highlighted in an editorial featured in ALPA magazine on September 1, 2021, that ALPA "has been very clear that any vaccination requirements are an issue that must be bargained for and ultimately agreed to by each ALPA pilot group."

46. Likewise, on May 28, 2020, ALPA informed the United pilot membership to anticipate attempts by United's management to unilaterally amend the collective bargaining

agreement concerning working conditions due to the COVID-19 pandemic and rallied for a unified stance to thwart United's managerial endeavors.

47. However, the union shifted its stance during the autumn and early winter of 2020-21. ALPA negotiated several letters of agreement with United pertaining to seniority and furlough alleviation. Specifically, Letter of Agreement ("LOA") 20-05 was negotiated with United, then presented to the union membership for approval in alignment with Article XIII, Section 7 of the United MEC policy manual. This clause necessitates member approval when an agreement between the Defendant and United "substantially affect wages, working conditions."

48. Through Letter of Agreement (LOA 21-02), ALPA aided United's management in establishing a dual-tier system constraining compensation for unvaccinated pilots two months later, without delivering the LOA to United pilot membership – as mandated.

49. LOA 21-02 devised a bifurcated framework for pilots within United. Vaccinated pilots were granted the latitude to operate nearly all routes within the network, whereas unvaccinated pilots were confined to specific routes. The financial repercussions started to afflict the unvaccinated pilots as their route choices narrowed and their prospects for alternative routes were obliterated by the LOA's terms.

50. Subsequent to its enactment on May 25, 2021, United violated the stipulations of LOA 21-02 by demanding employees to substantiate their vaccine exemption requests prior to the LOA's conclusion.

51. In August 2021, Plaintiff tried to grieve this breach of the LOA and was turned away and told his point was moot as the company planned on ending LOA 21-02 with the September 27, 2021, vaccination deadline.

52. ALPA didn't contest this violation; instead, it posited that the matter was of a "personal" nature and thus, between its union members and United. Additionally, the union took no action to prevent United management from arbitrarily identifying and expanding the number of airports and countries as "vaccination destinations" per the stipulations of LOA 21-02. This action effectively narrowed the number of accessible airports for unvaccinated pilots, amplifying the chances that they would incur a financial detriment based on their vaccination status.

53. The senior leadership of ALPA exhibited personal animosity towards union members who remained unvaccinated. For instance, on May 27, 2021, the chairman of United Airlines Master Executive Counsel, Todd Insler, responded to a member voicing concerns over the emergency use authorization status of the vaccine with a harsh rebuke, advising the member to "go get a fucking shot and collect $4K or he can STFU."

### Defendants' Treatment of Plaintiff Joe Oka

54. Joseph John Oka worked for more than 28 years for United Airlines, reaching the position of captain in November, 2021, when he was promoted from first officer.

55. Mr. Oka was forced to deal with multiple obstacles because of COVID-19 policies.

56. For instance, Mr. Oka received his upgrade to captain on November 16, 2021 – five days *after* he was put on unpaid leave under United's coercive vaccination policy. This forced him to give up the captain's position and remain a first officer.

57. Two days after returning Mr. Oka to work, on March 30, 2022, United informed Mr. Oka that if he was not senior enough as a captain to bid around certain destinations prohibited by their choosing he would be forced to give up his captain upgrade to a base/equipment/seat (BES) available in the next upcoming vacancy bid.  What this means

is that First Officer Oka would get trained as a Captain and be junior in seniority then potentially be scheduled to one of the prohibited destinations. This would in turn force Captain Oka to choose from a list of BES available that might put him in a lower-paying equipment or seat and/or cause him to have to switch bases. The hardship created by this non-contractual and un-negotiated work condition forced him to give up the captain's position and remain a first officer.

58. Mr. Oka, who's a Catholic, holds sincere religious objections to the COVID-19 vaccine that prevented him from complying with United's vaccination mandate.

59. For example, Mr. Oka eschews medical products that use aborted fetal cells in their development, production and implementation. And he follows the church teaching on Therapeutic Proportionality. By this teaching the recipient of a medical intervention or treatment must assess whether the benefits of the proposed medical intervention or treatment outweigh the undesirable side-effects and burdens that come with them. This assessment is not taken lightly and the church teaches the assessment involves looking at the integral good of the recipient, their family, as well as spiritual, psychological and bodily goods. The teaching of Therapeutic Proportionality affirms that this assessment must be respected and can only be made by the potential recipient (the Plaintiff) not by public health authorities or a corporation.

60. Mr. Oka requested religious accommodation and exemption from United's mandate. Without an approved religious or medical exemption, Mr. Oka knew that he would be terminated on September 27, 2021, United's deadline for its employees to get the COVID-19 vaccine.

61. Following the submission of his exemption request, United pestered Mr. Oka with additional questions regarding his religious beliefs, vaccination history, and a request for third-party validation of his sincerely held religious beliefs.

62. Mr. Oka was subject to disparate treatment as an unvaccinated employee. For example, in the Spring of 2021, United offered a bonus of 14 hours extra pay for employees who got the vaccination, which would have amounted to about $4,000 for Mr. Oka, had he agreed to get vaccinated. Since Mr. Oka wasn't vaccinated, he lost out on this bonus.

63. In September 2021, United approved Mr. Oka's religious exemption.

64. However, the only "accommodation" provided by United was placement on an indefinite leave of absence without pay, benefits, vacation, retirement contributions, or travel privileges – which is no accommodation at all.

65. United left Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of his body by receiving the experimental COVID-19 vaccine, at the expense of his religious beliefs, and even his health, or losing his livelihood and being unable to provide food, housing, and support for himself and his family.

66. On November 11, 2021, Mr Oka was on unpaid leave as United began denying compensation.

67. Mr. Oka remained on unpaid leave for about five months, during which time he was denied all pay and benefits.

68. United's discriminatory actions caused severe financial hardship and emotional distress to Mr. Oka.

69. He lost about $197,000 in pay and benefits, plus another $100,000 in back pay since he had to give up his post as a captain and remain a first officer.

70. LOA 21-02 established a two-tier structure for pilots within United. Vaccinated pilots were allowed to fly virtually all routes within the system while unvaccinated pilots were limited to specific routes. Pilots who were unvaccinated began to suffer financial loss as their routes were limited and their options for taking on alternative routes were shut down by the terms of the LOA.

71. Mr. Oka came back to work at United on March 28, 2022.

72. Two days later, on March 30, he was given a list of 30 countries that he couldn't fly to. If he was assigned to one of those countries, he would get dropped without pay.

***COVID Vaccines Violate Plaintiff's Religious Beliefs***

73. Plaintiff holds sincere concerns surrounding the process used to manufacture the vaccines.

74. Presently, all COVID-19 vaccines have made use either in production or testing of fetal cell lines developed from tissues derived from aborted fetuses (see excerpt below).[1]



In various stages of vaccine development and manufacturing, some of the COVID-19 vaccines used cells originally isolated from fetal tissue (often referred to as fetal cells), some of which were originally derived from an aborted fetus. The use of fetal cell lines is a very sensitive and important topic within some faith communities and among individuals with concerns about the ethics of using materials derived in this way.

75. For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[2]

---

[1] *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021)

[2] Are the vaccines made with fetal cells, Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mrna-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, Fact v. Fiction: Johnson & Johnson Vaccine(2021) available at https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-

76. In an interview with WREG-TV, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."[3]

77. As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[4] All HEK 293 cells are descended from tissue taken in 1973 from either an elective abortion or miscarriage[5] that took place in the Netherlands.[6]

78. While the production of the vaccines did not reportedly require any new abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

79. Plaintiff believes any benefit the COVID-19 vaccines may confer flows from the unjust exploitation of unborn human life. On this basis alone, Plaintiff refused on religious grounds to accept or be forced to accept the COVID-19 vaccines.

*/// ///*

---

johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

[3] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccin*e (March 5, 2021) available at https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

[4] *See*, Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?*, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells, (last visited on Aug. 26, 2021).

[5] *COVID-19 Vaccine and Fetal Cell Lines.*

[6] *Ibid.*

## COUNT I:  VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. § 2000e et seq. – Religious Discrimination

80. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

81. Title VII prohibits "discriminat[ion] against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015).[7]

82. Title VII imposes upon an employer the duty to make reasonable accommodations for the religious observances short of incurring an undue hardship.

83. Plaintiff asserted bona fide religious beliefs that conflicted with United's mandatory vaccine policy and notified United of those beliefs by filing an exemption and accommodation request per United's policies.

84. Defendants United and ALPA utterly failed to offer any reasonable accommodation, failed to engage in the interactive process with Plaintiff after promising it in company web pages, and failed to perform an individualized assessment of Plaintiff's request. Although Defendant granted Plaintiff's religious exemption request, Defendant offered

---

[7] As the Supreme Court has recognized, employees' "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit [legal] protection." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Additionally, though membership in or adherence to the tenets of an organized religion is plainly sufficient to provide protection for an individual's sincerely held religious beliefs, it is not a necessary precondition. *See Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989)

an "accommodation" that was no accommodation at all – unpaid, unprotected, and unelected leave of absence.

85. Defendants took adverse employment action against Plaintiff by constructively terminating employment by putting Plaintiff on unpaid leave.

86. By denying reasonable accommodation and executing punitive measures against Plaintiff, Defendants discriminated against Plaintiff due to his religious beliefs.

87. Defendants' failure to provide religious accommodations has substantially injured Plaintiff. Being placed on unpaid leave because of his religious beliefs – and having the threat of termination hang over him for months – was stressful and depressing for Plaintiff.

88. On these facts, Plaintiff establishes a prima facie case that shows Defendants failed to make any reasonable accommodation, discriminated against him on the basis of religion, and violated Plaintiff's Title VII rights.

89. Defendants cannot show that allowing Plaintiff to continue in his position as he had been successfully doing, let alone denying alternative reasonable accommodations such as masking, would have imposed an undue hardship.

90. As such, Defendants have violated Plaintiff's rights under Title VII by discriminating against him on the basis of his religious beliefs and failing to provide reasonable accommodation.

### COUNT II:  VIOLATION OF THE KENTUCKY CIVIL RIGHTS ACT - SECTION 344.040 – Religious Discrimination

91. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

92. Under the Kentucky Civil Rights Act, it is unlawful for an employer to "fail or refuse to hire, or to discharge any individuals, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, *religion*, national origin, sex, age forty (40) an dover, because the person is a qualified individual with a disability…" 344.040(1)(a).

93. 344.040(1)(b) also prohibits employers from "limit[ing], segregat[ing] or classify[ing[ employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect status as an employee, because of the individual's . . . religion."

94. Employers are required to make reasonable accommodations to the religious needs of employees so long as they can be made without undue hardship. *Irvin v. Aubrey*, 92 S.W.3d 87, 89 (Ky. Ct. App. 2001). The hardship to an employer must exceed a *de minimum* cost. *Id.*

95. Plaintiff holds sincere religious beliefs that preclude him from receiving a COVID-19 vaccine. While there may be some who consider COVID-19 vaccines to be acceptable, no employer in Kentucky, public or private, is permitted to decide for itself whose religious beliefs are valid, and whose are not.

96. Once an employee has articulated his or her sincerely held religious objections to acceptance or receipt of the currently available COVID-19 vaccines, the proper inquiry is thus at its end as to that element.

97. Defendant's COVID-19 vaccine mandate, which threatens termination for non-compliant employees, discriminates against employees who do not wish to receive the vaccine on religious grounds.

98. Plaintiff sought an exemption from United's COVID-19 vaccine mandate based on his sincere religious beliefs.

99. Defendants granted Plaintiff's exemption request – but forced him to go on unpaid leave. Plaintiff was left without any compensation nor benefits.

100.   As such, United has failed to provide *any* reasonable accommodation, but has rather implemented a punitive measure against employees who choose to exercise their religious rights.

101.   United was made fully aware of the conflict between its COVID-19 vaccine mandate and Plaintiff's religious beliefs. United responded with disciplinary action by discharge poorly disguised as an accommodation.

102.   As a result of United's draconian mandate, Plaintiff, and other similarly situated employees, were forced to seek alternative employment during his leave of absence.

103.   Plaintiff's position, should he decide to get vaccination, would not be guaranteed upon his return.

104.   United's failure to provide reasonable accommodations to Plaintiff's sincere religious beliefs has injured and will continue to injure Plaintiff by discriminatorily denying his income and by terminating his livelihood.

105.   Because Plaintiff has established a *prima facie* showing of religious discrimination, the burden would then shift to United to demonstrate that it could not accommodate the Plaintiff's religious needs without undue hardship, which it cannot do here.

106.     United cannot show that affording Plaintiff other accommodations (scheduled testing, masking, etc.), many of which United has been implementing since March 2020, would impose an undue hardship in the context of employer vaccination policies.

107.     United has thus failed to consider any reasonable accommodations to Plaintiff.[8] Rather, United has implemented a consequence that is tantamount to termination and a far cry from the "individualized" assessment required by the EEOC.[9]

108.     As such, United discriminated against Plaintiff based on his sincerely held religious beliefs, failed to provide a reasonable accommodation to Plaintiff's religious exemption request, and therefore, violated the Kentucky Civil Rights Act.

## COUNT III:  Breach of the Duty of Fair Representation

109.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

110.     In this claim, Plaintiff accuses ALPA of neglecting its duty of fair representation towards the Plaintiff under the Railway Labor Act ("RLA"), 48 U.S.C. § 151 et seq.

111.     Courts have interpreted the RLA to impose a duty of fair representation on unions due to their exclusive bargaining status. It's the jurisprudence surrounding the RLA and labor relations that have solidified and clarified the concept of the duty of fair representation.

---

[8] See EEOC Guidance for employers whose employees are unable to be vaccinated due to their sincerely held religious beliefs. What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws (the "COVID-19 Technical Assistance", https://www.eeoc.gov/newsroom/eeoc-issues-updated-covid-19-technicalassistance, last visited on September 26,2021.
[9] *See supra,* at section J, ¶¶ 103-110.

112.     A union is seen as breaching its duty of fair representation if its actions are arbitrary, discriminatory, or carried out in bad faith, as per *Martin v. American Airlines, Inc.*, 390 F. 3d 601, 606 (8th Cir. 2004).

113.     The union's collusion with Plaintiff's employer, United Airlines, and the refusal to address Plaintiff's valid grievances against the new vaccination mandate are deemed violations of their duty of fair representation, given that such conduct is seen as being in bad faith, arbitrary, and discriminatory.

114.     The actions alleged in the preceding paragraphs either directly or indirectly contravened the United Pilots Agreement (Section 1(a)) between Defendant and United, along with the stipulations of the RLA. Despite its earlier assertion that the vaccine mandate would be a mandatory subject of collective bargaining before implementation, Defendant ALPA chose to overlook United's unlawful actions and instead endorsed and supported them.

115.     Bad faith in a union occurs when actions or failures to act stem from improper motives, as per *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003). Defendant ALPA collaborated with United in rolling out the vaccine mandate, declined to contest the mandate, and refused to represent pilots who were placed on unpaid leave or terminated due to the mandate.

116.     According to 45 U.S.C. § 156, both Defendant ALPA and United were obliged to notify employees of an "intended change in agreements affecting rates of pay, rules, or working conditions." United was prohibited from altering rates of pay, rules, or working conditions while these changes were under mediation and finalization—essentially, United was required to uphold the "status quo."

20

117.     When United Airlines went against the collective bargaining agreement and the RLA by unilaterally enforcing the vaccine mandate, Defendant ALPA was obliged to challenge the implementation of this mandate, given that it altered the rates of pay and working conditions for unvaccinated pilots specifically.

118.     Defendant ALPA was wrongly driven by its wish to represent United's interests and its own leadership bias, instead of representing its members fairly, as it was legally obliged to do. This bias was exhibited as Defendant ALPA sought to gain favor with the leadership of United Airlines and other politically connected groups advocating for vaccine mandates.

119.     Defendant ALPA's negligence in adhering to its own policies that necessitated member ratification of LOAs, and its collusion with United to not challenge an alternative to the company's fundamental employment conditions, was so unreasonable as to be irrational. Moreover, by colluding with United and not submitting LOA 21-02 for member ratification, Defendant's actions towards Plaintiff were sinister, deceitful, and dishonest, demonstrating arbitrary, discriminatory, or bad faith motivation.

120.     Arbitrary conduct is described as conduct that is "so far outside a wide range of reasonableness as to be irrational," as per *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991).

121.     To violate the duty of fair representation, discriminatory conduct must be "intentional, severe, and unrelated to legitimate union objectives," as per *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Emps. Of Am. V. Lockridge,* 403 U.S. 274, 301 (1971).

122.     United effectively bifurcated pilots into two groups with LOA 21-02—those vaccinated and those unvaccinated, continuing this discrimination in its vaccine mandate. Defendant ALPA did not challenge United's discriminatory policies where vaccinated pilots enjoyed certain benefits and incentives, while unvaccinated pilots encountered dropped flights and salary reductions.

123.     Defendant ALPA's prejudiced and discriminatory conduct was further exacerbated by its refusal to advocate for unvaccinated pilots who were put on unpaid leave or terminated following the mandate's implementation. Defendant ALPA's collaboration with United and refusal to challenge the two-tier system and the mandate was deliberate, severe, and unrelated to valid union objectives.

124.     As a direct consequence of Defendant ALPA's bad faith, arbitrary, and discriminatory behavior, and its failure to fulfill its duty of fair representation to Plaintiff, the Plaintiff has been, and continues to be deprived of full wages and benefits under his employment with United Airlines.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays for the following relief:

a.  For a finding that Defendants United and ALPA violated Title VII of the Civil Rights Act of 1964, the Kentucky Civil Rights Act and any other relevant statute when it engaged in religious discrimination against Plaintiff and failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

b.  For a finding that Defendant ALPA violated the Railway Labor Act and breached its duty of fair representation;

c.  An order that Plaintiff be compensated, to the extent allowable, for his monetary

damages, stress and emotional upheaval;

d.  An order that Defendants pay Plaintiff's costs associated with bringing this lawsuit,

including his reasonable attorneys' fees and costs; and

e.  A grant of any such further relief as the Court deems necessary and proper in the public

interest.

DATED: October 3, 2023                          Respectfully submitted,

/s/ Taylor J. Ferguson
Taylor J. Ferguson, Atty No. 97655
BIESECKER DUTKANYCH & MACER, LLC
144 N. Delaware St.
Indianapolis, Indiana 46204
Office:    (317) 991-4765
Facsimile:        (812) 424-1005
Email:   tferguson@bdlegal.com
*Counsel for Plaintiff*

Robert E. Barnes, Esq.
California Bar No. 235919
Lexis Anderson, Esq.
*Subject to admission pro hac vice*
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Email: robertbarnes@barneslawllp.com
Email: lexisanderson@barneslawllp.com

***Counsel for Plaintiff Joseph John Oka***

23